IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| L.B., by and through his next friend, GUILLERMO B., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:24-cv-118 |
| KATY INDEPENDENT SCHOOL DISTRICT, | § § § § | |
| Defendant. | § § | |

## ORIGINAL COMPLAINT

### I. INTRODUCTION

1. This is a civil action brought pursuant to 20 U.S.C. § 1415(i) to appeal and to obtain a reversal of an erroneous decision (the "Decision," attached as Exhibit A) by a hearing officer in an administrative proceeding. Furthermore, because the actions and omission of Defendant Katy Independent School District have been so egregious, Plaintiff asserts further claims under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and seeks monetary relief in connection with those claims. This action also seeks injunctive relief, economic damages, and attorneys' fees for time spent in representing Plaintiff in the proceeding below and in litigating the instant Complaint.

### II. JURISDICTION

2. This Court has jurisdiction pursuant to 20 U.S.C. § 1415, 28 U.S.C. §§ 1331 and 1343, and 29 U.S.C. § 794.

3. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) because the events that give rise to this Complaint occurred in this district.

### III.    PARTIES

4. Plaintiff L.B. is a nineteen-year-old student with disabilities who lives with his father and next friend, Guillermo B., in or around Katy, Texas. He resides within the geographical area served by the Katy Independent School District ("KISD").

5. Defendant KISD is a duly incorporated Independent School District located primarily in Harris County. KISD is the resident school district for L.B. and is responsible for providing him with a free appropriate public education under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq*. ("IDEA").

### IV.    STATEMENT OF FACTS

6. Plaintiff L.B. is a nineteen-year-old student with disabilities who has attended school in the Katy Independent School District ("KISD"). KISD deems him eligible to receive special education instruction and services through the categories of Intellectual Disability and Other Health Impairment ("OHI"). KISD recognizes Plaintiff's OHI areas as Quadriparesis and Epilepsy. Plaintiff has attended school in Katy ISD since preschool. During the 2022-2023 school year, Plaintiff was in the 18+ Transition Program at KISD (the "Transition Program").

7. In May 2022 for Plaintiff's Annual Admission, Review and Dismissal ("ARD") meeting—the meeting at which decisions are made with respect to Plaintiff's Individualized Education Program ("IEP")—the teacher for the Transition Program (the "Transition Teacher"), who had at that point never worked with Plaintiff previously, designed his goals for the 2022-2023 school year based on (1) a life plan previously developed for him on April 9, 2022 (the "Life Plan") and a discussion with his father. She did not speak about the goals with any staff members who had known Plaintiff previously, although she spoke with some about Plaintiff generally. Even after having developed the goals in connection with Plaintiff's father, she did

not speak with any other KISD staff members as to whether those goals were appropriate. Thus, with the exception of speaking with a physical therapist about a mobility goal KISD was intending to add, the Transition Teacher had Plaintiff's father propose the goals and then she checked to make sure they were consistent with the Life Plan.[1] She relied on this process despite the fact that she spoke with Plaintiff's father for twenty minutes or less and was personally unsure of whether he understood what was going on. She presented these goals at Plaintiff's May 10, 2022 ARD meeting, merely "popp[ing] into" the ARD meeting briefly for that purpose. Plaintiff's goals were not based on proper evaluation and assessment.

8. Plaintiff made no progress on his functional goals during the 2022-2023 school year. Despite forming the opinion in the beginning of September that Plaintiff was making no progress, the Transition Teacher did not call for an ARD meeting at that time, which would have been the appropriate step to make necessary adjustments to Plaintiff's IEP. The ARD Committee on November 8, 2022, proposed new goals, once again dictated by the Transition Teacher. The ARD deliberations reflect that KISD admitted its staff members did not know Plaintiff and claimed the earlier goals were from Plaintiff's prior homebound teacher. However, as discussed above, the Transition Teacher did not develop the goals in conjunction with the homebound teacher or any other KISD staff member, but simply took them from Plaintiff's father. In fact, she did not even know who the homebound teacher was. Likewise, the

---

[1] The Life Plan was developed on April 9, 2022, while Plaintiff was still receiving Homebound services. The correspondence from Plaintiff's physician releasing him from Homebound services and approving his return to in-person instruction and services was effective May 9, 2022. Moreover, that Life Plan only indicates that Plaintiff would live at home with his family. Nowhere does it indicate that Plaintiff's post-KISD career would be limited to the home environment.

adjustments proposed in November 2022 to Plaintiff's IEP were not grounded in appropriate assessments or understanding of Plaintiff's unique needs, characteristics, and circumstances.

9. KISD never implemented the new goals proposed at the November 8, 2022 ARD meeting because Plaintiff's parents disagreed with them. Although the Transition Teacher later claimed that Plaintiff's goals from May 2022 were continued after this ARD meeting, his progress reports show that his goals for communication, for self-propulsion in his wheelchair, and for eating independently were all discontinued as of November 3, 2022.

10. From the outset the Transition Teacher and other KISD staff members in the 2022-2023 school year had considerable difficulty feeding Plaintiff or giving him liquids at school. In response to an October 11, 2022, email from Plaintiff's father expressing concern about the feeding issue the Transition Teacher showed little eagerness to resolve the issue, commenting simply: "I am also very worried, but there is not much we can do. I hope he eats at home to make up for it." By contrast, Plaintiff's parents took the initiative to address the issue by having Plaintiff's mother come in to show KISD staff how to do the feeding.

11. Although they interpreted Plaintiff's failure to eat when they tried to feed him as food refusal behaviors, KISD staff members did not request a Functional Behavior Assessment in October 2022, when they began discussing these concerns with Plaintiff's parents, despite the fact that such an assessment would be called for in trying to ascertain why a student would engage in food refusal of this sort. In fact, such an evaluation was not requested until Plaintiff's advocate did so in December 2022. Once the evaluation was completed on February 16, 2023, it did not conclude that Plaintiff was engaged in a problematic food refusal behavior, but rather determined that more information was needed. The consequences of Plaintiff eating and

drinking an insufficient amount are even greater than for the average individual, as KISD staff understood that malnutrition and dehydration could lead to increased seizure activity for him.

12.     Plaintiff's parents ultimately offered to come to the school and feed Plaintiff themselves if he refused food.  KISD refused to allow this, citing district policy, despite the fact that the Transition Teacher recognized that Plaintiff's parents were very successful in feeding him and that allowing them to feed him would improve his nutrition.  The Transition Teacher indicated that having Plaintiff's mother come to school to feed him would defeat the purpose of his transitional goal, which was for him to live at home.  However, this was premised again on a Life Plan which, as discussed above, was itself based on the idea that Plaintiff was receiving Homebound services.

13.     Nevertheless, without appropriately considering other options, the Transition Teacher and her supervisor proposed that Plaintiff receive only a half-day of instruction and services from KISD, so that he could return home for feeding.  They continued this recommendation in the March 20, 2023 ARD, going through contortions to show that Plaintiff's transitional needs could be met in a half-day.  As the proposed schedule demonstrates, only 45 minutes was actually allocated for work on transitional objectives.  Rather than focusing on Plaintiff's unique needs, characteristics, and circumstances, KISD staff thus made determinations based on their own administrative convenience.

14.     During the 2022-2023 school year, the Transition Teacher sent welcome letters and parent letters throughout the school year to the families of the students in the Transition Program.  These letters consistently emphasized the Community-Based Instruction ("CBI") opportunities made available to the students, discussing such opportunities at a much greater length and frequency than any other sort of activity and thus emphasizing their centrality to the

5

Transition Program. As the Transition Teacher testified, CBI formed an important part of the activities in the Transition Program in that "community is very important for students who are in transition age especially" because "it's a part of everybody's adult life." In her Welcome Overview packet to the parents, the Transition Teacher included a slideshow that she presented at open house. In that slideshow, the Transition Teacher expressly indicated that "[a]ll students participate in community based instruction[,]" thus further emphasizing its centrality to the Transition Program. Likewise, the slideshow indicated that there was "something in Katy's community for each one of our students." In fact, up until the fall semester of 2022, the Transition Teacher had never had a student in the Transition Program that did not participate in CBI.

15. In the fall semester of 2022, Plaintiff went along with his entire special education class on CBI opportunities to local grocery stores, pizza establishments, mini-golf, picnicking, and even a prairie conservancy. These outings lasted anywhere from two hours to five hours. However, KISD abruptly stopped bringing Plaintiff on CBI outings on November 17, 2022, as a result of a November 14, 2022, email from Plaintiff's father that expressed concern about KISD staff needing to change Plaintiff more frequently because of the danger of prolonged contact with feces. The Transition Teacher initially responded that she would speak with her team to address the changing routine. However, after consulting with her supervisor, she unilaterally communicated to Plaintiff's father that Plaintiff could not be changed on such outings and would no longer be permitted to participate in them. In fact, it turns out that KISD staff had never changed Plaintiff on such outings at all, despite the fact that, as noted above, some last as much as five hours in duration, as noted above. The Transition Teacher did not (1) reveal this fact to Plaintiff's father, (2) discuss the issue of whether Plaintiff had been in contact with feces for

more than an hour, or (3) otherwise engage with Plaintiff's parents concerning the issues relevant to determining whether and how Plaintiff could participate in CBI.

16. KISD staff claimed not to have believed that they could take a changing table to use for Plaintiff on CBI outings. However, in the unlikely event that this is the case (unlikely in part because KISD never considered the various mechanisms through which this could be accomplished), KISD staff members only used a changing table for this purpose because they would not allow Plaintiff to stand without bracing which was unavailable at that time. They insisted on maintaining this position even after receiving a letter from Plaintiff's physician in December 2022 indicating that Plaintiff did not require bracing and could stand without such support. In fact, his physician specifically indicated that bracing should *not* be used and that Plaintiff should not be in a wheelchair for prolonged periods of time. Nevertheless, disregarding this physician guidance entirely, KISD insisted on continuing in its previous path and continued to refuse to allow Plaintiff to participate in CBI outings with the rest of the Transition Program, despite the fact that if Plaintiff were allowed to stand, he could be changed without a changing table and could continue to go on CBI outings. Because KISD ignored the input of Plaintiff's parents and his physician, Plaintiff was deprived of these opportunities.

17. For years prior to the 2022-2023 school year, KISD's speech therapist had evaluated Plaintiff and deemed him eligible for speech therapy and services. For example, she supervised and approved Plaintiff's evaluation as part of his March 2019 Full Individual Evaluation. The evaluation indicated that Plaintiff continued to meet the eligibility criteria for an impairment in speech and language. In the 2020-2021 school year she worked with Plaintiff on speech goals and services. She participated in an analysis for Plaintiff in September 2021 in

7

which it was noted that Plaintiff had improved in his communication skills between 2014 and 2019.

18. In May 2022, the speech therapist participated in an ARD meeting for Plaintiff in which once again the ARD Committee found Plaintiff eligible for speech therapy and services. As of May 2022, because of staffing issues, Plaintiff had not received such speech therapy and services since the closure of schools in 2020 due to the pandemic. The ARD Committee adopted a communication goal for Plaintiff involving making certain choices. Plaintiff would receive speech therapy and services during the 2022-2023 school year for fifteen minutes once per grading period.

19. In the beginning of the 2022-2023 school year, the speech therapist worked with Plaintiff on his communication goal and also on other sorts of communication-related activities. She believed she was successful in providing Plaintiff speech therapy and services in the fall of 2022, although he was not successful on his particular IEP goal. However, after the parents and their advocate wanted evaluations in all areas, the speech therapist developed an evaluation based on the idea that Plaintiff had plateaued in his communication skills over the years and thus no longer required or would benefit from speech services.

20. The actual evaluation the speech therapist developed, however, does little more than note that Plaintiff had remained at the unconventional level of communication for a number of years. There was no comparison of different historical evaluations to determine whether there had been any improvements within the contours of the unconventional communication stage. There was no specific data put forward with respect to any testing results or how such results might compare with prior testing. Thus the speech evaluation was fatally flawed from the start.

21. Moreover, a review of Plaintiff's history in receiving speech therapy and services belies the conclusion put forward in the February 2023 evaluation. In that evaluation, it justifies dismissing Plaintiff from speech services with the comment that "[Plaintiff] has been at the unconventional communication stage of development for 9 years and has been provided with various therapeutic intervention techniques with limited improvement." However, as noted above, while Plaintiff might have been at the unconventional communication stage, he had sufficient improvement within that stage between 2014 and 2019 to warrant continuation of services. Then in 2020 he stopped receiving speech services altogether until after the May 2022 ARD. It would be impossible to describe that period of time as including the provision of "various therapeutic intervention techniques" when he received no direct speech services of any kind.

22. Thus, the speech therapist could only have reached her conclusion on the basis of the small stretch of time after Plaintiff began receiving services again. However, during this stretch of time, as noted above, she viewed herself as having been successful in providing services to Plaintiff, except in connection with an IEP goal which KISD staff had long since determined was inappropriate. Thus, the speech therapist could point to no specific time period in which it would make sense to assert that Plaintiff had actually reached a plateau, instead pointing vaguely to an entire nine-year stretch. Faced with these factors militating against the ultimate conclusion in her February 2023 evaluation, it is unsurprising that the speech therapist stated in an email to another speech pathologist a mere six days before that evaluation that "I am not sure how I can say there is no educational need." Despite her denials and contortions, it is clear that the speech therapist recognized full well Plaintiff's educational need for speech

services, but refused to acknowledge that need in her evaluation. On information and belief, she was prompted to reach this conclusion in predetermined fashion by KISD administrators.

23. While Plaintiff was generally delighted to go to school prior to his entry into the Transition Program, he experienced significant and obvious negative emotional impact because of KISD's egregious failures. Through a lack of adequate hydration and nutrition, lack of physical exercise, prolonged periods of sitting during the extended school day, and isolation from other student activities due to his specific disabilities, Plaintiff came to look at KISD with fear and distrust. When the bus would come to pick him up in the mornings, Plaintiff would show signs of frustration and fear. These feelings intensified over time as KISD's own actions and omissions became more and more egregious.

24. Faced with KISD's massive failures to provide appropriate transition instruction and services to their son, Plaintiff's parents began more thoroughly investigating possible alternative institutions that could provide employment or other transition opportunities to Plaintiff. They found numerous such institutions that serve a diverse population, including individuals with severe disabilities. KISD had ample opportunity to provide meaningful transition opportunities to Plaintiff by connecting him to such institutions. KISD instead focused on doing as little as possible at school and focusing its attention on getting Plaintiff back into his home environment—precisely the opposite of the purpose for which the transition program is intended and certainly not conducive to Plaintiff's unique needs, characteristics, and circumstances.

25. Plaintiff's father filed an administrative due process complaint on Plaintiff's behalf pursuant to the Individuals with Disabilities Education Act to challenge KISD's actions

and omissions recounted above and its resultant failure to provide her son a Free Appropriate Public Education.

26. After a hearing on August 23-25, 2023, the administrative hearing officer assigned by the Texas Education Agency to preside over the matter erroneously denied Plaintiff the relief he sought.

27. As the decision of the administrative hearing officer was erroneous, Plaintiff files this appeal.

## FIRST CAUSE OF ACTION (IDEA)

28. Plaintiff incorporates by reference paragraphs 1-27 of this Complaint.

29. The administrative hearing officer erred in denying Plaintiff the relief he requested.

30. Plaintiff hereby appeals the decision of the administrative hearing officer pursuant to 20 U.S.C. § 1415(i).

31. Plaintiff seeks reversal of the administrative hearing officer's decision and an order requiring Defendant to provide the relief sought by Plaintiff in the underlying administrative proceeding, including private placement at FISD's expense.

32. Pursuant to 20 U.S.C. § 1415(i)(3), Plaintiff is entitled to reasonable attorneys' fees if he prevails in the current litigation.

## SECOND CAUSE OF ACTION (SECTION 504)

33. Plaintiff incorporates by reference paragraphs 1-32 of this Complaint.

34. Plaintiff is a "disabled/handicapped" individual as defined in 29 U.S.C. § 705.

35. Plaintiff has been denied and excluded from significant benefits of Defendant's program which would have, if properly designed and implemented for Plaintiff, had the possibility of providing a Free Appropriate Public Education to Plaintiff.

36. Defendant receives federal financial assistance in implementing its programs.

37. Defendant's level of deliberate indifference, bad faith, and gross misjudgment in failing to provide a safe environment for Plaintiff designed to promote his educational progress was and continues to be sufficiently egregious to constitute discrimination under Section 504.

38. As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer irreparable harm.

**PRAYER**

Plaintiff seeks reversal of the administrative hearing officer's decision and an order requiring Defendant to provide the remedies sought in Plaintiff's underlying administrative due process complaint and listed in the Hearing Officer's Decision attached as Exhibit A, including, but not limited to, the development and implementation of an appropriate Individualized Education Program, compensatory services, and training for implementing staff. In addition, Plaintiff requests the following:

- Monetary damages in compensation for Defendant's wrongdoing;
- Reimbursement for costs and expenses incurred as a result of Defendant's wrongdoing as articulated above; and, specifically,
- Payment for Plaintiff's reasonable and necessary attorneys' fees and costs of the suit.

DATED: January 10, 2024                              Respectfully Submitted,

                                                       ___/s/ Mark Whitburn_____
Mark Whitburn
State Bar No. 24042144
Sean Pevsner
State Bar No. 24079130
Whitburn & Pevsner, PLLC
2000 E. Lamar Blvd., Suite 600
Arlington, Texas 76006
Tel: (817) 653-4547
Fax: (817) 653-4477
mwhitburn@whitburnpevsner.com

13