IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| L.B., by and through his next friend, GUILLERMO B., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:24-cv-118 |
| KATY INDEPENDENT SCHOOL DISTRICT, | § § § | |
| Defendant. | § § | |

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

I.    BACKGROUND FACTS ..................................................................................... 1

    A.   Plaintiff and His Disabilities and Characteristics ........................................ 1

    B.   Plaintiff's Goals for the 2022-2023 School Year Were Based on a Brief Conversation with Plaintiff's Father and Checked Against a Life Plan Premised on Plaintiff Receiving Homebound Services. ..................................... 1

    C.   KISD Failed to Feed and Hydrate Plaintiff Sufficiently and Denied the Request of Plaintiff's Parents to Come to School to Feed Him as Needed. ........................ 3

    D.   KISD Impermissibly Stopped Taking Plaintiff on Community-Based Instruction Opportunities When His Father Indicated He Needed to Be Changed More Often. ........... 6

    E.   KISD Terminated Plaintiff's Speech Therapy, Inaccurately Contending that He Had Reached a Plateau and Thus No Longer Required Such Services. ............................... 10

II.    ARGUMENT ...................................................................................................... 13

    A.   Issues Presented and Standard of Review ................................................... 13

    B.   Defendant Failed to Individualize Its Program for Plaintiff on the Basis of His Assessment and Performance. .................................................................. 14

    C.   KISD Did Not Provide Instruction and Services in the Least Restrictive Environment Appropriate to Plaintiff's Needs. ............................................ 21

    D.   KISD Did Not Collaborate Properly with Plaintiff's Parents. ..................... 22

    E.   KISD Has Not Provided Plaintiff Positive Academic and Non-Academic Benefits. 23

III.    CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**CASES**

*Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*,
328 F.3d 804 (5th Cir. 2003)……………………………………………………………14, 15

*Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*,
580 U.S 386 (2017)……………………………………………………………………14

*Richardson Indep. Sch. Dist. v. Michael Z.*,
580 F.3d 286 (5th Cir. 2009)……………………………………………………………..14

*Teague Indep. Sch. Dist. v. Todd L.*,
999 F.2d 127 (5th Cir. 1993)……………………………………………………………14, 15

**STATUTES**

20 U.S.C. § 1412(a)(5)……………………………………………………………….21, 22

Plaintiff L.B., by and through his next friend, Guillermo B., hereby submits his Motion for Judgment on the Administrative Record and would respectfully show the Court as follows:

<h1 align="center">I.    BACKGROUND FACTS</h1>

**A.    Plaintiff and His Disabilities and Characteristics**

Plaintiff L.B. is a twenty-year-old student with disabilities[1] who has attended school in the Katy Independent School District ("KISD").  *See, e.g.*, AR 801.  KISD deems him eligible to receive special education instruction and services through the categories of Intellectual Disability and Other Health Impairment ("OHI").  *Id.*  KISD recognizes Plaintiff's OHI areas as Quadriparesis and Epilepsy.  AR 6, 802.

Plaintiff has attended school in KISD since preschool.  AR 761.  During the 2022-2023 school year, Plaintiff was in the 18+ Transition Program at KISD (the "Transition Program")—a program designed to help students transition out of the educational environment and into the next stage of their lives in the community.  AR  6, 10, 719, 1688.  In the 2022-2023 school year, Ms. Kodlubanska was Plaintiff's teacher in the Transition Program.  AR 1688.

**B.    Plaintiff's Goals for the 2022-2023 School Year Were Based on a Brief Conversation with Plaintiff's Father and Checked Against a Life Plan Premised on Plaintiff Receiving Homebound Services.**

In May 2022 for his Annual ARD, Renata Kodlubanska, the teacher for the Transition Program, who had at that point never worked with Plaintiff previously, designed his goals for the 2022-2023 school year based on extremely limited information: (1) a life plan previously developed for him on April 9, 2022 (the "Life Plan," AR 713-7) and a discussion with his father. AR 1679-82.  She did not speak about the goals with any staff members who had known Plaintiff previously, although she spoke with some about Plaintiff generally.  AR 1680-2.  Even after

---

[1] Plaintiff was nineteen at the time of the due process hearing.  AR 6, 801.

having developed the goals in conjunction with Plaintiff's father, she did not speak with any

other KISD staff members as to whether those goals were appropriate. AR 1682. Thus, with the

exception of speaking with a physical therapist about a mobility goal KISD was intending to add,

Ms. Kodlubanska had Plaintiff's father propose the goals and then she checked to make sure they

were consistent with the Life Plan. AR 1150, 1682-3, 1819.[2] She relied on this process despite

the fact that she spoke with Plaintiff's father for twenty minutes or less and was personally

unsure of whether he understood what was going on. AR 1150, 1683-4.[3] She presented these

goals at the May 10, 2022 ARD meeting, "popp[ing] into" the ARD meeting briefly for that

purpose. AR 1158, 1680, 1691-3. Ms. Kodlubanska did not then work with Plaintiff during the

remainder of the spring or summer of 2022, but only began working with him in the beginning of

the 2022-2023 school year. AR 1684.

Plaintiff made no progress on his functional goals during the 2022-2023 school year. AR

719, J Ex. 24 at Time Stamp 5:35; AR 1401-5, 1537-40, 1719-20, 1741-2, 1810-12. Despite

forming the opinion in the beginning of September that Plaintiff was making no progress, Ms.

Kodlubanska did not call for an ARD meeting at that time. AR 1862-4. The ARD Committee

on November 8, 2022, proposed new goals, once again dictated by Ms. Kodlubanska. AR 721-2,

1727-9. The ARD deliberations reflect that KISD admitted its staff members did not know

Plaintiff and claimed the earlier goals were from Plaintiff's prior homebound teacher. AR 722.

---

[2] The Life Plan was developed on April 9, 2022, while Plaintiff was still receiving Homebound services. AR 713, 1720-3. The correspondence from Plaintiff's physician releasing him from Homebound services and approving his return to in-person instruction and services was effective May 9, 2022. AR 673, 700. Moreover, that Life Plan only indicates that Plaintiff would live at home with his family. AR 713, 1722-3. Nowhere does it indicate that Plaintiff's post-KISD career would be entirely limited to the home environment. AR 713-7.

[3] Ms. Kodlubanska indicates Plaintiff's father was very clear as to the goals. AR 1683-4. However, even if true, this would mean that the goals discussion was a mere subset of a discussion that even as a whole lasted less than twenty minutes.

2

*See also* J Ex. 24, at Time Stamp 28:12-15.  However, as discussed above, Ms. Kodlubanska did

not develop the goals in conjunction with the homebound teacher or any other KISD staff

member, but simply took them from Plaintiff's father.  In fact, even at the due process hearing,

she did not even know who the homebound teacher was.  AR 1864.

KISD never implemented the new goals proposed at the November 8, 2022 ARD meeting

because Plaintiff's parents disagreed with them.  AR 728, 1735-6.  Although Ms. Kodlubanska

claims that Plaintiff's goals from May 2022 were continued after this ARD meeting, his progress

reports show that his goals for communication, for self-propulsion in his wheelchair, and for

eating independently were all discontinued as of November 3, 2022.  AR 1537-40, 1878.

**C.    KISD Failed to Feed and Hydrate Plaintiff Sufficiently and Denied the Request of Plaintiff's Parents to Come to School to Feed Him as Needed.**

From the outset Ms. Kodlubanska and other KISD staff members in the 2022-2023

school year had considerable difficulty feeding Plaintiff or giving him liquids at school.  *See,*

*e.g.*, AR 1205, 1704-9.  In response to an October 11, 2022, email from Plaintiff's father

expressing concern about the feeding issue Ms. Kodlubanska showed little eagerness to resolve

the issue, commenting simply: "I am also very worried, but there is not much we can do.  I hope

he eats at home to make up for it."  AR 1205, 1704-9.  By contrast, Plaintiff's parents took the

initiative to address the issue by having Plaintiff's mother come in to show KISD staff how to do

the feeding.  AR 1205, 1706-7, 1928.  Although Ms. Kodlubanska claims that she was present

once or twice when Plaintiff's mother came in for that purpose, Plaintiff's mother testified that

Ms. Kodlubanska was never present.  AR 1706-7, 1928.  Plaintiff's mother was successful in

feeding Plaintiff on these occasions.  AR 1707.

School district staff members have tried to explain their failures in two mutually

contradictory ways.  First, Ms. Kodlubanska testified that Plaintiff would exhibit behaviors

indicating he did not want to eat when KISD staff members tried to feed him, whereas he did not

exhibit such behaviors with Plaintiff's mother. AR 1707-8, 1711-3. She then indicated that

Plaintiff's mother advised them on certain techniques to employ in case of food refusal that her

supervisor indicated could not be used in the school setting. AR 1208, 1713-6, 1888-91.

Second, the school nurse suggested in observing one of the videos of Plaintiff's mother feeding

him liquid that the mother herself was force-feeding Plaintiff.[4] J Ex. 54; AR 2087-8. Even a

cursory glance at the video at issue shows that Plaintiff's mother was not force-feeding him. J

Ex. 54. Moreover, if the school nurse actually believed Plaintiff's mother was force-feeding him,

she could not reasonably have recommended as she did that school staff try to feed Plaintiff as

his mother did. AR 1207, 2090-2.[5] In any event, as noted below, all techniques demonstrated

by Plaintiff's mother were techniques taught her originally by KISD staff. As discussed below,

the first explanation has no greater force.

Although they interpreted Plaintiff's behaviors as food refusal behaviors when they tried

to feed him, KISD staff members did not request a Functional Behavior Assessment in October

2022, when they began discussing these concerns with Plaintiff's parents. AR 1708-16. In fact,

---

[4] The confusion of KISD staff members regarding Plaintiff's feeding is further evidenced by the incoherence of the communications surrounding the November 8, 2022 ARD in this context. On October 24, 2022, two weeks before the ARD, Ms. Kodlubanska sent an email to the speech therapist indicating that there would be no feeding goal. AR 1223. However, a feeding goal was ultimately proposed in the ARD. AR 732. Ms. Kodlubanska explains this as occurring because KISD staff members decided to put the feeding goal on hold until more evaluations by specialists were done. AR 1738-41. However, no such evaluations were proposed in the November 8, 2022 ARD, but a feeding goal was. Evaluations of Plaintiff's feeding were not proposed until the December 2022 ARD when it was Plaintiff's parents and advocate who insisted on such evaluations. AR 1897-8. Ms. Kodlubanska testified that there were observations and trials by the specialists in the October 2022-November 2022 timeframe. AR 1741. However, the eventual evaluator, Ms. Douglass, testified that she did not even receive the evaluation request until December 16, 2022, after the evaluations were requested by Plaintiff's advocate. AR 2171.
[5] The school nurse never talked to any of Plaintiff's former teachers to find out how they had managed to feed him over the course of his lifetime at KISD. AR 2089-90.

such an evaluation was not requested until Plaintiff's advocate did so in December 2022.  AR 1897-8.  Once the evaluation was completed on February 16, 2023, it did not conclude that Plaintiff was engaged in a problematic food refusal behavior, but rather determined that more information was needed.  AR 850-2.  The consequences of Plaintiff eating and drinking an insufficient amount are even greater than for the average individual, as KISD staff understood that malnutrition and dehydration could lead to increased seizure activity.  AR 1247, 1744.

Plaintiff's parents ultimately offered to come to the school and feed Plaintiff themselves if he refused food.  *See, e.g.*, J Ex. 24, at Time Stamp 44:30-45:20.  KISD refused to allow this, citing district policy, despite the fact that Ms. Kodlubanska recognized that Plaintiff's parents were very successful in feeding him and that allowing them to feed him would improve his nutrition.  J Ex. 24, at Time Stamp 44:30-45:20; AR 1855-6, 1865-8.  Ms. Kodlubanska indicated that having Plaintiff's mother come to school to feed him would defeat the purpose of his transitional goal, which was for him to live at home.  AR 1865-8.  However, this was premised again on a Life Plan which, as discussed above, was itself based on the idea that Plaintiff was receiving Homebound services.  While Ms. Kodlubanska's supervisor also felt that having the parents come to campus to feed would conflict to some extent with the purpose of the Transition Program, she did not rule it out as a possibility.  AR 1892-5.

Nevertheless, without considering other options, Ms. Kodlubanska and her supervisor proposed that Plaintiff receive only a half-day of instruction and services from KISD, so that he could return home for feeding.  AR 1208, 1888-96.  They continued this recommendation in the March 20, 2023 ARD, going through contortions to show that Plaintiff's transitional needs could be met in a half-day.  AR 1413, 1908-9.  As the proposed schedule demonstrates, only 45 minutes was actually allocated for work on transitional or vocational objectives.  AR 1413.

**D.     KISD Impermissibly Stopped Taking Plaintiff on Community-Based Instruction Opportunities When His Father Indicated He Needed to Be Changed More Often.**

During the 2022-2023 school year, Ms. Kodlubanska sent welcome letters and parent letters throughout the school year to the families of the students in the Transition Program. *See, e.g.*, AR 1152-3, 1159, 1162, 1174, 1185, 1688-91, 1697. These letters consistently emphasized the Community-Based Instruction ("CBI") or Jeanne Coleman Support Annex ("JCSA")[6] opportunities made available to the students, discussing such opportunities at a much greater length and frequency than any other sort of activity and thus emphasizing their centrality to the Transition Program. *See, e.g.*, AR 1185, 1699-1700. As Ms. Kodlubanska testified, CBI formed an important part of the activities in the Transition Program in that "community is very important for students who are in transition age especially" because "it's a part of everybody's adult life." AR 1690-1. In her Welcome Overview packet to the parents, Ms. Kodlubanska included a slideshow that she presented at open house. AR 1162, 1693-4. In that slideshow, Ms. Kodlubanska expressly indicated that "[a]ll students participate in community based instruction[,]" thus further emphasizing its centrality to the Transition Program. AR 1170, 1694-5. Likewise, the slideshow indicated that there was "something in Katy's community for each one of our students." AR 1171, 1697. In fact, up until the fall semester of 2022, Ms. Kodlubanska had never had a student in her program that did not participate in CBI. AR 1695-6.

In the fall semester of 2022, Plaintiff went along with his entire special education class on Community-Based Instruction opportunities to local grocery stores, pizza establishments, mini-golf, picnicking, and even a prairie conservancy. AR 1180-4, 1186, 1190-5, 1197-1202, 1204, 1209-22, 1697-1700, 1718-9, 1737-8. These outings lasted anywhere from two hours (AR 1181,

---

[6] The JCSA is a building that belongs to Katy ISD that has an area set up as a skills practice lab in which students would practice skills learned in school. AR 1170, 1690, 1694-5.

6

1699) to 3.5 hours (AR 1193, 1701-2), and even up to five hours (AR 1203, 1703-4).  He also

went on outings to the JCSA.  AR 1187-8, 1700-1.

However, KISD abruptly stopped bringing Plaintiff on CBI outings on November 17,

2022, as a result of a November 14, 2022, email from Plaintiff's father that expressed concern

about KISD staff needing to change Plaintiff more frequently because of the danger of prolonged

contact with feces.  AR 1247, 1257.  The Transition Program teacher, Ms. Kodlubanska, initially

responded that she would speak with her team to address the changing routine.  AR 1247.

However, after consulting with her supervisor (AR 1249-55), she unilaterally communicated to

Plaintiff's father that Plaintiff could not be changed on such outings and would no longer be

permitted to participate in them.  AR 1258, 1260.  In fact, it turns out that KISD staff had never

changed Plaintiff on such outings at all, despite the fact that some last as much as five hours in

duration, as noted above.  AR 1747-9.  Ms. Kodlubanska did not (1) reveal this fact to Plaintiff's

father, (2) discuss the issue of whether Plaintiff had been in contact with feces for more than an

hour, or (3) otherwise engage with Plaintiff's parents concerning the issues relevant to

determining whether and how Plaintiff could participate in CBI.  AR 1258, 1745-7.  Plaintiff

continued to participate in JCSA outings.  *See, e.g.*, AR 1262, 1274, 1772-3, 1779.

KISD staff claimed that there was no way to change Plaintiff on outings into the

community, although Ms. Kodlubanska did not reference this supposed impossibility in her

response to Plaintiff's father.  AR 1254, 1258, 1749.  KISD staff members changed Plaintiff

using two people and a changing table because they took the view that Plaintiff was unable to

stand.  AR 1734-5.  The places the Transition Program would go during CBI outings did not

have an adult-size changing table.  AR 1749.  KISD staff did not investigate the possibility of a

portable changing table or other alternatives.  AR 1750-1, 1898-1902.

7

Moreover, as demonstrated by videos provided by Plaintiff's parents to KISD, Plaintiff can stand and walk. J Exs. 60, 61, 62, 63. *See also* AR 722. As noted above, KISD's use of a changing table was premised on their view that Plaintiff could not stand. However, as Ms. Kodlubanska explained during the December 6, 2022 ARD meeting, KISD staff members would not allow Plaintiff to stand. J Ex. 25, at Time Stamp 18:28 to 18:33. Thus, KISD was preventing Plaintiff from facilitating their changing him in a way that would have allowed him to go on CBI outings without the need for a changing table. KISD staff members took the position that Plaintiff needed braces to stand, despite the fact that the videos show him standing and walking without braces. AR 723. They maintained that position even after receiving a letter from Plaintiff's physician immediately after the December 6, 2022 ARD meeting indicating that Plaintiff did not require bracing to stand. AR 1103. In fact, his physician specifically indicated that bracing should *not* be used and that Plaintiff should not be in a wheelchair for prolonged periods of time. AR 1103. Nevertheless, disregarding this physician guidance entirely, KISD insisted on continuing in its previous path and continued to refuse to allow Plaintiff to participate in CBI outings with the rest of the Transition Program.[7]

Ms. Kodlubanska indicated that options were discussed by the ARD Committee and that the ARD Committee would have allowed him to go on CBI opportunities, except for the fact that the relevant ARD meeting was never concluded and thus the CBI issue was never actually discussed. AR 1757-64. Ms. Kodlubanska testified that, if the ARD Committee had made this determination, she would have had to shorten the CBI outings for everyone. AR 1757-62.

---

[7] This continued even after KISD received a physician note dated February 28, 2023, that even KISD's physical therapist admits was sufficient to demonstrate that Plaintiff did not need bracing to stand or to walk. AR 19, 1125, 2116. Although the therapist claimed that it was safer to change Plaintiff on a changing table, she admitted that Plaintiff could bear weight on his legs for an unlimited period of time with someone holding onto him. AR 2121, 2123-4.

However, she herself then testified that one option would involve simply having Plaintiff driven back to school if he had a bowel movement so that he could be changed on campus.  AR 1762-3, 1876.  If this would have been an option after an ARD Committee decision, it would have been an option in November 2022 when the issue first arose.  However, as noted above, KISD staff members never discussed such options with Plaintiff's parents or among themselves.[8]  Moreover, contrary to Ms. Kodlubanska's testimony, (1) nothing in the ARD documentation for November and December 2022 indicates that the ARD Committee intended to propose that Plaintiff have the opportunity to participate in CBI outings (AR 718-757),[9] (2) the ARD meeting was concluded in disagreement at the December 2022 ARD (AR 726), and (3) even the ARD documentation for March 2023 does not clearly indicate an intent to allow participation in CBI opportunities (AR 775-844).[10]  In any event, KISD continued to bar Plaintiff from participating in CBI outings after the December 2022 ARD meeting.  *See, e.g.*, AR 1271, 1777-9.  The ARD Committee  did not have any discussion at all of CBI participation for Plaintiff until March 20,

---

[8] On December 8, 2012, two days after the December 6, 2022, ARD meeting, Plaintiff's father sent an email characterizing KISD's refusal to allow Plaintiff to attend CBI outings as discrimination.  AR 1275.  Such an email would have been incomprehensible if the ARD Committee two days earlier had expressed a willingness to allow such participation.  Ms. Kodlubanska did not reach out to Plaintiff's parents in response to this email to alert them to the fact that the ARD Committee could address their concerns and allow Plaintiff to participate in CBI.  AR 1780-1.  In fact, other than forwarding the email to her supervisor, she took no action whatsoever in response.  *Id.*

[9] Ms. Kodlubanska strangely testified that she continued to get permission slips regarding Plaintiff attending CBI opportunities because the ARD Committee could make a relevant change at any moment.  *See, e.g.*, AR 1264-8, 1775-6.  However, as noted in the text above, the ARD documentation for November and December 2022 contained no indication that the ARD Committee intended to consider this issue.

[10] Ms. Kodlubanska contradicted herself on the issue of whether CBI outings were discussed in the  December 2022 ARD meeting.  On the one hand, she testified that this issue was discussed.  *See, e.g.*, AR 1764.  On the other hand, she testified that it was not discussed because they did not have the opportunity to discuss it prior to the termination of the ARD.  AR 1763.  In fact, the issue of CBI opportunities never arose before the ARD Committee until March 20, 2023, but even then there was no coherent response from the school district.  AR 829, 1805-10.

9

2023. *See, e.g.*, AR 829-30, 1327, 1782, 1805, 1871. Even after that ARD, KISD did not allow Plaintiff to participate in the CBI outings. AR 1440-1, 1812-4, 1871-3. Ms. Kodlubanska testified that KISD continued to keep Plaintiff from participating in these CBI outings even after the March 2023 ARD meeting because the ARD Committee did not reach agreement on the entire IEP. AR 1871-5. Nothing in the ARD documentation addressed the issue of changing Plaintiff on CBI outings, so Ms. Kodlubanska would have had to find some way of having Plaintiff participate in the community, despite the changing issue.

Rather than have their son left behind on campus without the rest of the Transition Program, Plaintiff's parents kept him home on days scheduled for CBI outings, except for one occasion in May 2023. AR 1755-7. On this one occasion on May 16, 2023, the paraprofessional recalled some sorting activities that she did with Plaintiff on that date but made no reference to working with him on IEP goals. AR 1441, 2043-4. However, even if the paraprofessional did work on IEP goals with Plaintiff, they would have been IEP goals on which he had made no progress throughout the year and which KISD staff members had already determined were inappropriate. AR 1755-6.

**E.    KISD Terminated Plaintiff's Speech Therapy, Inaccurately Contending that He Had Reached a Plateau and Thus No Longer Required Such Services.**

For years prior to the 2022-2023 school year, KISD's speech therapist, Charnita Jones, had evaluated Plaintiff and deemed him eligible for speech therapy and services. She supervised and approved Plaintiff's evaluation as part of his March 2019 Full Individual Evaluation. AR 400, AR 1940-1. The evaluation indicated that Plaintiff continued to meet the eligibility criteria for an impairment in speech and language. AR 400. In the 2020-2021 school year she worked with Plaintiff on speech goals and services. AR 528, 545, 1941-4. She participated in a REED

for Plaintiff in September 2021 in which it was noted that Plaintiff had improved in his

communication skills between 2014 and 2019.  AR 646, 652, 1945.

In May 2022, Ms. Jones participated in an ARD meeting for Plaintiff in which once again

the ARD Committee found Plaintiff eligible for speech therapy and services.  AR 675, 701, AR

1945-7.  As of May 2022, because of staffing issues, Plaintiff had not received such speech

therapy and services since the closure of schools in 2020 due to the pandemic.  AR 675, 1947-55,

1958-9.  The ARD Committee adopted a communication goal for Plaintiff involving making

certain choices.  AR 687, AR 1955-7.  Plaintiff would receive speech therapy and services during

the 2022-2023 school year for fifteen minutes once per grading period.  AR 697, 1957-8.

Ms. Jones did not work with Plaintiff during the summer of 2022, but began working

with him in beginning of the 2022-2023 school year.  AR 1959-61.  She worked with him on his

communication goal, but also on other sorts of communication-related activities.  AR 1959-60.

Ms. Jones believed she was successful in providing Plaintiff speech therapy and services in the

fall of 2022, although he was not successful on his particular IEP goal.  AR 1965-7.  Ms. Jones

participated in a REED evaluation for Plaintiff in December 2022.  AR 1758-68.  The parents

and their advocate wanted evaluations in all areas.  AR 1968.  As the last testing had been done

in March 2019, it was determined that more testing should be done.  AR 767, 1968-70.

On February 23, 2023, Ms. Jones emailed the lead speech therapist over evaluations

asking for guidance on how to draft a dismissal of a student from speech services.  AR 1335,

1971-5.  She developed an evaluation based on the idea that Plaintiff had plateaued in his

communication skills over the years and thus no longer required or would benefit from speech

services.  AR 1342, 1971-6.  The actual evaluation Ms. Jones developed on February 27, 2023,

however, does little more than note that Plaintiff had remained at the unconventional level of

11

communication for a number of years.  AR 865-7.  Unlike the September 2021 REED (AR 645-652), there was no comparison of different historical evaluations to determine whether there had been any improvements within the contours of the unconventional communication stage.  AR 865-7.  There was no specific data put forward with respect to any testing results or how such results might compare with prior testing.  AR 865-7.  Ms. Jones relied on a developmental profile and communication matrix that did not involve scoring,  but rather gave general assessments as far as a student's skill levels.  AR 1976-87.  Although Ms. Jones indicated that a comparison  was possible between the communication matrix results (AR 865-7) and the functional communication profile she had supervised previously (AR 398-9), even a brief glance at both reveals that no such comparison is possible, as the former contains such generalized characterizations that it is impossible to compare them to the assessments in the latter.

In any event, a review of Plaintiff's history in receiving speech therapy and services belies the conclusion put forward in the February 2023 evaluation.  In that evaluation, it justifies dismissing Plaintiff from speech services with the comment that "[Plaintiff] has been at the unconventional communication stage of development for 9 years and has been provided with various therapeutic intervention techniques with limited improvement."  AR 866-7.  However, as noted  above, while Plaintiff might have been at the unconventional communication stage, he had sufficient improvement within that stage between 2014 and 2019 to warrant continuation of services.  Then in 2020 he stopped receiving speech services altogether until after the May 2022 ARD.  It would be impossible to describe that period of time as including the provision of "various therapeutic intervention techniques" when he received no direct speech services of any kind.  Thus, Ms. Jones could only have reached her conclusion on the basis of the small stretch of time after Plaintiff began receiving services again.  However, during this stretch of time, as

12

noted above, she viewed herself as having been successful in providing services to Plaintiff, except in connection with an IEP goal which KISD staff had long since determined was inappropriate. Thus, Ms. Jones could point to no specific time period in which it would make sense to assert that Plaintiff had actually reached a plateau, instead pointing vaguely to an entire nine-year stretch. AR 1988-2000. Faced with these factors militating against the ultimate conclusion in her February 2023 evaluation, it is unsurprising that Ms. Jones stated in an email to another speech pathologist a mere six days before that evaluation that "I am not sure how I can say there is no educational need, but if I leave it up to ARD committee Karen will eat me up." AR 1379, 2000-5. Despite her denials and contortions, it is clear that Ms. Jones recognized full well Plaintiff's educational need for speech services, but understood that the ARD Committee intended to terminate such services and that Plaintiff's advocate, Karen Cunningham, would take her to task for it. AR 1379, 2000-5.

In fact, Ms. Kodlubanska had proposed a communication goal in November 2022 that contemplated having the speech therapist as an implementer of the goal. AR 731, 1736. Likewise, KISD proposed a goal very close to that for the March 20, 2023, omitting the speech therapist as an implementer only because Plaintiff had been dismissed from speech therapy in the interim. AR 815, 1799-1801.

## II.    ARGUMENT

### A.    Issues Presented and Standard of Review

To provide a Free Appropriate Public Education to a disabled child for purposes of the Individuals with Disabilities Education Act (the "IDEA"), the state must develop an IEP through IDEA procedures in such a manner that it is "reasonably calculated to enable the child to receive educational benefits." *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 293 (5th Cir.

2009). Moreover, a school district cannot rely on a simple showing that it provided educational benefits of some kind or another. It must have provided educational benefits appropriate to that child's unique characteristics, needs, and circumstances. *See, e.g.*, *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S 386, 400-1 (2017). The Fifth Circuit has articulated four factors that would bear on such an inquiry: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *Michael Z.*, 580 F.3d at 293. The issue before this Court is whether the Hearing Officer below erred in determining that these factors did not favor Plaintiff. In fact, all four factors militate in favor of a finding that KISD failed to provide Plaintiff a Free Appropriate Public Education.

Under the IDEA, "a federal district court's review of a state hearing officer's decision is 'virtually de novo.'" *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003) (quoting *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993)). The "hearing officer's findings should be accorded 'due weight,' but the district court must arrive at an independent conclusion based on a preponderance of the evidence." *Id.* (quoting *Teague*, 999 F.2d at 131).

**B.    Defendant Failed to Individualize Its Program for Plaintiff on the Basis of His Assessment and Performance.**

Defendant failed to individualize its program for Plaintiff on the basis of his assessment and performance.

As an initial matter, as discussed in Section I.B above, KISD developed its goals for Plaintiff for the 2022-2023 school year based on nothing more than a very brief conversation with Plaintiff's father, checked against the April 2022 Life Plan. Likewise, the new goals

proposed in November 2022 were developed to reflect the same Life Plan, despite the fact that the Life Plan itself was developed with Plaintiff still receiving homebound services.  AR 1724-7. *See also* J Ex. 25, at Time Stamp 43:48 to 44:35 (confirming that the goals and Life Plan were based on Plaintiff receiving homebound services).  Even Ms. Kodlubanska recognized that KISD should have developed goals based on evaluations.  AR 1332, 1782-4.  However, as discussed in Section I.B above, she did not reference any evaluation in developing Plaintiff's goals in May 2022.  Likewise, when new goals were proposed in November 2022, Ms. Kodlubanska did not reference or request evaluations to serve as the basis for those goals.  AR 1784-6.  Evaluations were not requested until Plaintiff's advocate did so in December 2022.  AR 723, 1784-6;  J Ex. 25, at Time Stamps 18:28-33, 20:33-50.  The Hearing Officer below determined that KISD's efforts in this regard were sufficient because Plaintiff's goals had historically involved living at home.  AR 24.  However, the cursory nature of KISD's approach, the reliance on a brief "plan" that does not incorporate full evaluations of Plaintiff, and KISD's dismissal of even the findings of the Life Plan that indicate Plaintiff should avail himself of all opportunities in the community just as his peers did highlight the insufficiency of this approach.

Throughout the 2022-2023 year, KISD staff seemed to have little familiarity with KISD's own evaluations of Plaintiff historically.  For example, when Plaintiff's father shared a private evaluation of Plaintiff's intellectual functioning during the November 8, 2022, ARD meeting (J Ex. 24, at Time Stamp 32:01-34:24), KISD staff were forced to table the ARD entirely (J Ex. 24, at Time Stamp 34:58-35:26) because they deemed the private evaluation inconsistent with the goals of the Transition Program.  However, they were unable to compare the assessment of the private evaluation with the conclusions of KISD personnel, despite the fact that Plaintiff had attended KISD since early childhood.

Not only did KISD staff not appropriately base goals and planning on evaluations, but they did not request evaluations when necessary to guide their approach to issues they encountered.  For example, although Ms. Kodlubanska and other KISD staff members interpreted Plaintiff's responses to their feeding efforts as food refusal behaviors, they did not request a Functional Behavior Assessment in October 2022 to determine the function of such perceived behaviors.  AR 1708-9.  Instead, despite the fact that she is not a behavior specialist herself, Ms. Kodlubanska assumed that the function of the behavior was simply to refuse food.  AR 1708-9.  She reached out to her own supervisor, Paula Donnella, and the school nurse, but neither of them requested a Functional Behavior Analysis either.  AR 1207, 1709-13.  In fact, the nurse indicated that KISD staff should try to feed Plaintiff the way his mother fed him.  AR 1207, 1709-13.  The supervisor, on the other hand, after reviewing Ms. Kodlubanska's description of how Plaintiff's mother advised them to address the feeding issue if Plaintiff exhibited food refusal behaviors, simply indicated that KISD staff could not do that and that his day would have to be shortened to a half day.  AR 1208, 1713-6.  They did not propose a Functional Behavior Assessment or consider options other than the half-day proposal,[11] despite the fact that the half-day proposal ran counter to the IEP developed in May 2022, which indicated that Plaintiff would attend the Transition Program  for a full day, to be adjusted only as the parents deemed necessary.  AR 700, 1208, 1716-8.  As explained in Section I.C above, once a Functional Behavior Assessment was finally completed in February 2023, the evaluator did not conclude that Plaintiff was engaged in problematic food refusal behaviors, but indicated rather

---

[11] Likewise, when the Occupational Therapist believed that Plaintiff was displaying a lack of motivation, the therapist did not request a Functional Behavior Assessment or consult with a behavior specialist, despite acknowledging that the behavior specialist would have the expertise in this area.  AR 2073-9.  Likewise, KISD's music therapist never consulted with such a behavior specialist either.  AR 2138.

that more information was required.  KISD staff had not gathered that information by the time of the evaluation.  AR 1786-9.

The Hearing Officer below determined that Plaintiff adopted two opposing positions by seeking to have KISD provide him a full day of school, but then remaining at home because KISD could not feed him properly.  AR 26.  However, this analysis misses Plaintiff's point entirely.  As discussed above, KISD should have been able to feed Plaintiff at school by (1) gathering information from teachers and staff members in his past years at KISD who had fed him successfully, (2) conducting an FBA quickly to obtain information concerning his apparent "food refusal" behaviors, and/or (3) allowing Plaintiff's mother to assist with the feeding at school.  When KISD refused to do any of these things—any one of which would have allowed Plaintiff to remain at school for the full day—Plaintiff's parents had to keep him at home.

KISD similarly failed with respect to CBI opportunities.  Ms. Kodlubanska has suggested that Plaintiff did not, in fact, need CBI as part of his Transition Program because it was not expressly included in his May 2022 IEP.  *See, e.g.*, AR 1249-51, 1258, 1696-7, 1751-2.  However, as an initial matter, Ms. Kodlubanska brought Plaintiff on CBI outings until Plaintiff's father expressed concern about KISD staff not changing him with sufficient frequency.  *See* Section I.D above.  Ms. Kodlubanska and her supervisor then unilaterally determined that Plaintiff would no longer attend such outings on that basis.  *Id*.  It was only after having already made that determination that Ms. Kodlubanska sought additional retrospective support for that determination in the May 2022 IEP.  *Id*.

KISD makes much of the fact that Plaintiff's Life Plan from April 9, 2022, indicated that he would live at home.  AR 713.  However, at the time, Plaintiff was still receiving Homebound instruction and services and was not released from Homebound by his treating physician until

17

May 9, 2022.  AR 700.   In fact the Life Plan was expressly premised on the fact that Plaintiff

was receiving Homebound services.  AR 713.  Furthermore, even that Life Plan indicated that

Plaintiff "needs to be included in activities even if it looks like he is just on the edge of the

group[,]" that he had a "need for being included[,]" that he "love[d] to go/be outside[,]" and that

his parents were working with him "to become more independent where that is possible," and

that he loved "[l]ong trips, short road trips, or just running errands."  AR 713-5.[12]  It also

expressly indicated that KISD "should include [Plaintiff] in all activities even if he does not

appear to be engaged."  AR 715.  It further indicated that he needed to be "invited into each

activity that comes along" and that, in part because "[c]ommunication is key to his social

development[,]" he needed to be "included in the same way you would any other person."  AR

716.  There is nothing whatsoever in the Life Plan that suggests Plaintiff should only participate

in those activities that promote seclusion in the home environment.  In fact, the reverse is true

throughout the document.  Moreover, even if the Life Plan had done so, Ms. Kodlubanska

recognized that the Life Plan might change after Plaintiff was released from homebound

services.  AR 1724-5.  In fact, KISD staff members admitted during the November 8, 2022 ARD

meeting that their goals were premised on a Life Plan that was developed around the idea that

Plaintiff would be at home receiving homebound services as opposed to returning to school in-

person.  J Ex. 24, at Time Stamp 27:10-27:40.

Moreover, the Functional Vocational Evaluation (AR 853-61; "FVE") conducted by

KISD staff on February 27, 2023,  reinforced the need for inclusion already emphasized in the

Life Plan.  *See, e.g.*, AR 858 ("[Plaintiff's] limitations do not stop him from continuing to have a

---

[12] Ms. Kodlubanska herself emphasized that community exposure promotes independence.  AR
1697.

meaningful life, social interactions, and participating in all offered activities."); AR 859 (recommending to "explore volunteer opportunities in the community for [Plaintiff] . . . to expand options for [Plaintiff] to contribute and participate.")  With  Plaintiff now released from Homebound services, the FVE was further able to recommend to "[i]dentify specific activity segments [Plaintiff] could do in volunteer/training/work environments" as opposed to in the home.  AR 859.  Even Ms. Kodlubanska did not disagree with these findings.  AR 1789-93.  By the time the ARD Committee even tangentially addressed the issue in March 2023 after reviewing the FVE, the ARD Committee agreed that Plaintiff would "be going on trips."  AR 830.  There was no legitimate basis in Plaintiff's evaluations for having restricted his ability to participate in CBI.  Nevertheless, even after the completion of the FVE and the March 2023 ARD, KISD continued not to allow him to participate.  *See* Section I.D above.

In citing the May 2022 IEP as justification for refusing to allow Plaintiff to participate in CBI outings (AR 679, 1249), Ms. Kodlubanska overlooked the fact that this portion of the ARD documentation was premised  on the idea that Plaintiff was receiving Homebound services.  *See, e.g.*, AR 694-5.  Outside of the Homebound context, the suggestion that Plaintiff did not need community services is inconsistent with the statements in his Life Plan noted above.

The emptiness of KISD's argument that Plaintiff's May 2022 IEP served as a legitimate basis for failing to include him on CBI trips is further demonstrated by the fact that, even after unilaterally ending such inclusion, KISD continued to take Plaintiff on JCSA outings.  *See* Section I.D above.  Nothing in Plaintiff's May 2022 IEP serves as a basis for including Plaintiff in one as opposed to the other.  AR 667-712.  In fact, as Ms. Kodlubanska testified, the only differentiating feature was the fact that the JCSA location had changing tables.  AR 1853.  The Hearing Officer determined that the lack of changing tables was reason enough for the exclusion.

AR 27-28.  However, as discussed above, the evidence indicates that Plaintiff could stand sufficiently to allow an adult to change him and that, therefore, there was no need for a changing table.  The reason KISD believed it needed a changing table was because it refused to allow him to stand, contrary to the instructions and guidance provided by Plaintiff's physician.[13]

Ms. Kodlubanska claims that Plaintiff would work on IEP goals and other activities while he remained behind during the time the rest of the Transition Program went on CBI outings.  *See, e.g.*, AR 1258, 1753-6.  However, on the one occasion when Plaintiff attended school while the others were on a CBI outing, the paraprofessional who stayed behind with him made no reference to having worked on IEP goals with him.  *See* Section I.D above.

Finally, as discussed in Section I.E above, the KISD speech therapist dismissed Plaintiff from speech therapy services based ostensibly on a February 2023 evaluation.  As described in Section I.E, however, this evaluation merely drew an unwarranted conclusion from the fact that Plaintiff had remained for the previous nine years in the stage of unconventional communication.  However, as discussed in Section I.E, Plaintiff had (1) made improvements within the unconventional stage of communication between 2014 and 2019, thus showing no signs of a plateau, (2) received no direct speech services between the outset of COVID-19 in 2020 and May 2022, thus making it unlikely that he would progress substantially during that period, and (3) had a communication goal in the 2022-2023 school year that KISD staff members themselves deemed inappropriate, thus again making it unlikely that he would progress appropriately.  The

---

[13] The Hearing Officer indicated that Plaintiff had failed to show that changing while standing was hygienic.  AR 27-28.  However, as discussed above, KISD admitted that its decision to use a changing table was premised on Plaintiff's supposed inability to stand.  That admission presupposes that, if Plaintiff can stand, which Plaintiff showed that he could, a changing table would not be necessary.  KISD never contended that a changing table was necessary for hygienic purposes even if Plaintiff could stand.

speech therapist herself recognized a mere six days before the evaluation that she did not see how she could determine there was no educational need for speech services. *See* Section I.E above. Nevertheless, she inexplicably dismissed Plaintiff from such services. The Hearing Officer below accused Plaintiff of "contort[ing] the speech therapist's considerations, rather than providing evidence of an ongoing need. AR 27. However, as discussed above, KISD itself had recognized such an ongoing need for years and nothing had changed. The speech therapist herself admitted that she did not know how she could say there was no educational need. AR 1379, 2000-5. There was, as there had always been.

## C.    KISD Did Not Provide Instruction and Services in the Least Restrictive Environment Appropriate to Plaintiff's Needs.

Pursuant to 20 U.S.C. § 1412(a)(5), "[t]o the maximum extent appropriate, children with disabilities . . . [must be] educated with children who are not disabled . . . ." As discussed in Section I.D above, in April-May 2022, the ARD Committee believed Plaintiff would continue to receive homebound services and built that assumption into its ARD documentation. *See, e.g.*, AR 694. Consequently, it did not envision a need for CBI at that time. AR 679. However, despite recognizing that the landscape had changed entirely when it became possible for Plaintiff to return to in-person instruction at school. *See, e.g.*, J Ex. 25, at Time Stamp 43:48-44:35. However, despite allowing Plaintiff to participate in CBI outings for the first few months of school, KISD suddenly refused to do so any longer because Plaintiff's father asked that he be changed. *See* Section I.D above. Instead, KISD insisted that Plaintiff stay in a room at the school, secluded from all others except a paraprofessional. *See* Section I.D above.

Ms. Kodlubanska claimed that she needed an ARD Committee decision to impose a requirement that Plaintiff be taken on CBI outings, despite the fact that she had taken Plaintiff on such outings previously. She further indicated that, the only way she could accommodate this

option would be to shorten the outings altogether. *See, e.g.*, AR 1772. However, this contention falls flat. As an initial matter, although Ms. Kodlubanska fleetingly referenced the possibility of an ARD Committee decision in a November 18, 2022, email to Plaintiff's father (AR 1260), she never explained or clarified this idea to him in that email or elsewhere. AR 1260, 1772. Furthermore, KISD never brought up such a possibility in any ARD meeting after that point until obliquely in the March 20, 2023 meeting.[14] *See* Section 1.D above. Nothing in that March 2023 ARD document suggests that the CBI outings should be shortened, and there is no authority to suggest that the ARD Committee for one student in a class would have the authority to dictate for every other student in the class the potential durations of such outings or other community opportunities. Ms. Kodlubanska never brought up the idea of shortening CBI outings with Plaintiff's parents. AR 1772. Moreover, as she herself indicates, she could simply have had him brought back to campus if needed in a given outing. *See* Section I.D above. Furthermore, no such considerations would prove necessary if KISD staff members simply attended to the guidance of Plaintiff's physician and allowed him to stand. *See* Section I.D above. Then they would not need a changing table. *See id*.

**D.    KISD Did Not Collaborate Properly with Plaintiff's Parents.**

KISD did not collaborate properly with Plaintiff's parents.

The record is rife with examples of KISD withholding information from or unilaterally dictating outcomes to Plaintiff's parents, including, for example, (1) never informing them that they were not changing Plaintiff at all during CBI trips (Section I.D above), (2) unilaterally

---

[14] To the extent that KISD relies on this mere mention of the possibility of an ARD decision on this point in an email to Plaintiff's father, KISD overlooks the fact that 20 U.S.C. § 1412(a)(5) places the obligation to provide the least restrictive environment on the school district and not on the parents of the student.

refusing to allow Plaintiff to participate in CBI opportunities after Plaintiff's father expressed concerns about KISD changing Plaintiff with insufficient frequency (Section I.D above), and (3) unilaterally recommending a half-day of instruction and services for Plaintiff because of the difficulty in feeding him, instead of allowing Plaintiff's parents to come to school to feed him or considering other options (Section I.C above)

With respect to the issue of Plaintiff participating in CBI opportunities, not only did KISD staff simply issue a unilateral pronouncement to Plaintiff's parents that he would no longer participate (*see* Section I.D above), but they only exchanged a few brief email between themselves in making that decision. The few emails contained in the record (AR 1249-55) appear to constitute the entire communication on this subject between KISD staff. AR 1752-5. Afterwards, in contrast to her lengthy communications with other parents about CBI outings, referenced in Section I.D above, Ms. Kodlubanska only sent Plaintiff's parents cursory emails stating that he would work on his IEP goals and "have activities." *See, e.g.*, AR 1263. She did not give any account of what those activities might be. *Id.*; AR 1773-5. She never provided any explanation of such activities in any other context either. AR 1773-5, 1781-2.

When Plaintiff began exhibiting new biting behavior at school in February and March 2023, KISD staff did not immediately inform Plaintiff's parents, waiting until the second such incident in March 2023 to notify them. AR 1118-9, 1364, 1793-9. Furthermore, despite KISD informing Plaintiff's parents that an investigation into the behavior would be conducted, it does not appear that any such investigation was ever done or at least that any conclusions were ever shared with Plaintiff's parents. AR 1120, 1794-5, 1905-8.

**E.    KISD Has Not Provided Plaintiff Positive Academic and Non-Academic Benefits.**

KISD has failed to provide Plaintiff positive academic or non-academic benefits.

As an initial matter, KISD did not even provide Plaintiff adequate food and water, as explained in Section I.C above. KISD's explanations for these failures are internally contradictory. For example, Ms. Kodlubanska testified that Plaintiff did not exhibit food refusal behaviors with Plaintiff's mother, but did exhibit such behaviors with KISD staff, such that the former could feed him successfully while the latter could not. *See* Section I.C above. However, the school nurse testified that Plaintiff's mother used techniques that would force Plaintiff to consume sustenance when he was otherwise resisting. *See* Section I.C above. However, if Plaintiff did not exhibit food refusal behaviors when his mother fed him then such a circumstance would never arisen and KISD staff members could never have observed it. In any event, Plaintiff's mother testified that every technique that she employed in feeding Plaintiff and that she demonstrated to KISD staff was taught to her in previous years by KISD staff. AR 1928-9. *See also* AR 722 (documenting that Plaintiff's mother explained this to the ARD Committee); J Ex. 24, at Time Stamp 41:22-42:05 (same); AR 1729-31 (Ms. Kodlubanska never investigated the trainings these earlier KISD staff members had provided).[15] Thus, it could not have been some sort of force-feeding out of bounds for school district personnel.[16]

Furthermore, Plaintiff made no progress whatsoever on his IEP goals during the 2022-2023 school year. *See* Section I.B above. When Plaintiff's parents disagreed with the goals,

---

[15] She spoke only with Malinda K. Nash, a previous teacher, who had always been able to feed Plaintiff, although it was a difficult process. AR 1732. Ms. Kodlubanska did not obtain detailed information from Ms. Nash on how she managed this process or ask her to come demonstrate it in her class. AR 1733.

[16] KISD has taken pains to point to malnutrition concerns from three years ago to suggest that Plaintiff requires a GI-button. AR 1929-31. However, Plaintiff's medical circumstances have changed since that point and he has gained weight, thus taking away any basis for KISD's apparent contention on this issue. *See* AR 2173-80 (comparing AR 583-4, from October 2020 when Plaintiff had substantial seizure activity and was losing weight, with AR 574, from April 2021 when Plaintiff was presenting with stable weight gain, with AR 896-900, from December 2022, when Plaintiff had gained still more weight, thus obviating any need for a GI-button).

KISD staff claims to have continued to implement the ones from the May 2022 IEP, despite the fact that (1) they were based in no evaluation of Plaintiff, but merely derived from a brief conversation with Plaintiff's father, (2) Plaintiff had made no progress on them during the entire 2022-2023 school year, and (3) school staff believed them by that time to be inappropriate for Plaintiff. *See* Section I.B. Nevertheless, Plaintiff's progress reports show that his goals for communication, for self-propulsion in his wheelchair, and for eating independently were all discontinued as of November 3, 2022. AR 1537-40, 1878. In any event, whether Plaintiff's goals were continued or not, KISD staff did not seek to implement goals it believed were appropriate for Plaintiff, but merely allowed the disagreement with Plaintiff's parents to leave Plaintiff in a state of limbo in which he was left without any direction in which to progress.

### III.    CONCLUSION

In light of the foregoing, Plaintiff respectfully requests that this Court reverse the decision of the Hearing Officer below and grant his requested relief and order Defendant to provide that relief, including, but not limited to, developing an IEP designed to provide appropriate instruction and services for a full day, including speech therapy, training for staff members working with Plaintiff on appropriate mechanisms for implementing his IEP and for feeding and hydrating him, and providing him appropriate and meaningful transition and inclusion opportunities, including allowing him to participate in CBI outings along with the rest of the Transition Program.

DATE: September 13, 2024

Respectfully submitted,

s/_Mark Whitburn_____
Mark Whitburn
Texas Bar No. 24042144
Sean Pevsner
Texas Bar No. 24079130
Whitburn & Pevsner, PLLC
2000 E. Lamar Blvd., Suite 600
Arlington, Texas 76006
Tel: (817) 653-4547
Fax: (817) 653-4477
mwhitburn@whitburnpevsner.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on the following counsel for

Defendant by email on September 13, 2024:

Christopher B. Gilbert
Arlene P. Gonzalez
Thompson & Horton LLP
3200 Southwest Freeway, Suite 2000
Houston, Texas 77027

/s/_Mark Whitburn_____
Mark Whitburn

26